**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

CYNTHIA A. JONES,                              :

     Plaintiff,                              :

vs.                                            :   CA 14-00247-C

CAROLYN W. COLVIN,                             :
Acting Commissioner of Social Security,
                                     :

     Defendant.

**MEMORANDUM OPINION AND ORDER**

Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income.  The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court.  (Docs. 18 & 19 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.").) Upon consideration of the administrative record, the plaintiff's brief, the Commissioner's brief, and the arguments of counsel for the parties at the February 4, 2015 hearing before the Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

---

[1]     Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 17 & 19 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of
(Continued)

Plaintiff alleges disability due to degenerative disc disease, cervical and lumbar radiculopathy, history of subcutaneous lipoma left posterior shoulder, hypertension, and history of headaches.  The Administrative Law Judge (ALJ) made the following relevant findings:

> 1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.
>
> 2.      The claimant has not engaged in substantial gainful activity since July 30, 2009, the alleged onset date  (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> *      *      *
>
> 3.      The claimant has the following severe impairments: degenerative disc disease, cervical and lumbar radiculopahty, history of subcutaneous lipoma left posterior shoulder, hypertension and history of headaches (20 CFR 404.1520(c) and 416.920(c)).
>
> *      *      *
>
> 4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> *      *      *
>
> 5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a reduced range of light work as defined in 20 CFR 404.1567(b) and 416.967(b), in function by function terms (SSRs 83-10 and 06-8p), with certain non-exertional restrictions associated with that level of exertion. The claimant's specific physical capabilities during the period of adjudication have been the ability to lift/carry up to 10 pounds frequently and 20 pounds occasionally; sit for about 6 hours per day; stand and/or walk for up to 6 hours per day; perform limited pushing and/or pulling with the upper extremities; perform pushing and/or pulling with the lower extremities without limitation; use the right

---

Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

hand **for reaching (including overhead),** handling, fingering and feeling without limitation; use the left hand for reaching (including overhead) occasionally, and for handling, fingering and feeling without limitation; climb stairs and ramps, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch and crawl without limitation. The claimant could work in a job environment that would allow her to avoid concentrated exposure to extreme heat, extreme cold, hazardous machinery and heights. The claimant is capable of performing unskilled work.

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other **evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p.** The undersigned requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p. 96-Sp, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e.. an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned **must evaluate** the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

In a Disability Report submitted on April 26, 2010, the claimant alleged that her ability to work is limited by knots in the left shoulder, muscle spasm, migraines, nerve problems and 2 bulging discs. She reported that she stopped working on July 30, 2009, her alleged onset date. She completed the 10th grade *(See also* Exhibit 1 E), and was not in special education classes. The claimant reported that she cannot do her children's hair or her own hair, cannot drive tor long periods, and does not get much sleep. (Exhibit 9E).

Another Disability Report completed by a 3rd party was submitted on June 16, 2010, which indicated the claimant still has pain, and her arm

is numb when she lies on it while sleeping. She said the pain "comes and goes" in the neck and shoulder. She reported, "I stay depressed and it is very painful." At that time, she was taking Amitriptyline to sleep, Butalbital and Topiramate for migraines, Cyclobenzaprine for muscle spasms, Neurontin for nerves/bulging disc and Propoxyphene (Darvocet) for "nerves and disc." She reported no side effects to these medications. (Exhibit 20E).

At the December 20, 2011, hearing, the claimant testified that she lives with her grandmother and her three children, ages 16, 13 and 10. She quit school after the l0th grade, and passed all sections of the GED exam except math. However, the claimant said she can read, write and perform simple math calculations.

The claimant said she stopped working in July 2009, because she had pain in her neck and arm. She reported having CTS in the left hand, severe nerve damage in left arm and bulging discs. She sees Otis Harrison, MD, her treating internal medicine physician at Franklin, and is now "just on medications." She said she has had several MRls, but Medicaid would not pay for anything else. When asked about the problems she has with her left hand and arm, she responded that she has severe swelling, lifting her arm is painful, and her neck feels "like weight and pressure on [her] back." She said it burns and tingles, and she really cannot use the left arm.

The claimant drove herself to the hearing, and said none of her physicians have restricted her driving. She said her oldest daughter and son help her cook, as she is not able to cook or clean on her own. She said she does no cleaning and has to have help getting dressed because she can only lift her left arm "so high." However, she said she can bathe herself without help.

The claimant said she receives child support for youngest child. She has Medicaid coverage. However, she noted that she was turned down for Medicaid when she first applied because she was working. The claimant related that she found out that they would be able to give her Medicaid if she stopped working so she reapplied and was granted insurance.

The claimant said Medicaid would cover treatment with a neurologist; and she has had an injection, which did not help. She said she did not want to have any more injections because it hurt and did not relieve her symptoms. When asked if she has been told she needs surgery for her shoulder, the claimant said she was told by someone at Mobile Infirmary that she would have to see a neurologist, and surgery would

be most likely necessary.  However, she said she was told that surgery would be dangerous because they would have to go through her throat, so it could cause paralysis.  The claimant also said the physician at Mobile Infirmary said her neck and arm problem is not going to get any better; and the best thing to do is see a neurologist so it will not get worse.

The claimant said she lies around all day because her medications cause nausea.  She mentioned that she was taking Lortab, Valium, a blood pressure medication and Prednisone for muscle spasms.  The claimant reported that Amitriptyline makes her itch but "it helps a lot." She also said she was just put on for fibromyalgia, and commented that she thinks Lyrica causes some kind of stomach discomfort.  The claimant said she was on Neurontin in the past but was changed to Lyrica because "it is better for my nerves.''

At the April 9, 2012, hearing, the claimant testified that she still lives with her children; and she drove herself to the hearing.  She said she has seen Dr. Harrison once since the last hearing.  She said she is still taking the same medications, with the same side effects.  The claimant said her condition has gotten worse; and Dr. Harrison ordered an MRI and prescribed the cane on March 1, 2012.  She related the cane was prescribed to help with her balance due to problems with her hip "slipping ... and it catches in my leg and my lower back." She said her balance problems occur with just walking and her pelvis area "just slips." The claimant said she fell on her left leg and shoulder about 2 weeks ago, when she was outside with her son.  She said she sees Dr. Harrison again on April 22. 2012.

The claimant's recent medications include Lortab 10 as needed for pain; Gabapentin (Neurontin) for inflammation; Simvastatin for cholesterol; Topiramate (Topamax) for muscle spasms and migraines; Amlodipine (Norvasc) for high blood pressure; Amitriptyline (Elavil) daily and Diazepam (Valium) as needed for ''nerves,'' anxiety and/or muscle spasms; Orphenadrine (Norflex) for muscle spasms; Lexapro for depression; Meloxicam (Mobic) for inflammation; and Lyrica for neck pain and/or fibromyalgia.  (Exhibits 22E, 25E and 29E).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant has history of subcutaneous hematoma left posterior shoulder, which results in the limitation on her ability to lift/carry up to 10 pounds frequently and 20 pounds occasionally; use the left hand for reaching (including overhead) occasionally, and for handling, fingering and feeling without limitation; perform limited pushing and/or pulling with the upper extremities; and use the right hand for reaching (including overhead), handling, fingering and feeling without limitation.

The claimant presented to Franklin on August 24, 2009, complaining of a knot on her left shoulder since July 2007, and inability to hold her arm up. She said the knot began to irritate her 2-3 months ago, and rated her pain a 6/10 on the pain scale (0 = no pain, 10 = worst possible pain).  She was treated by a nurse practitioner, who noted the physical exam showed soft tissue swelling in the left shoulder with no induration or erythema. The nurse practitioner referred the claimant to James Lawrence, MD, a rheumatologist, at Franklin for further evaluation on September 12, 2009.  The claimant told Dr. Lawrence that she was involved in a motor vehicle accident (MVA) in 2007, but she did not actually recall the specific shoulder problem.  Dr. Lawrence noted the x-rays done on August 25, 2009 showed elevation of the distal clavicle at the AC joint, which may be secondary to a separation of the joint, "almost assuredly it was caused by the MVA." Dr. Lawrence noted the review of systems was negative for any signs of a connective tissue disorder. The physical exam showed definite tenderness on internal rotation of the left shoulder and limited abduction.  Dr. Lawrence noted that he strongly suspected that she had a rotator cuff tear.  He prescribed Tramadol and Diazepam for the muscle spasm in the trapezius muscle on the left.  He also noted he would give her Ketoprofen pending an MRI scan.  (Exhibit 6F).

Dr. Lawrence sent the claimant for an MRI of the left shoulder on September 18, 2009, which showed findings suggestive of a subcutaneous lipoma, and clinical follow-up was recommended. There was also a question of mild supraspinatus and infraspinatus tendinosis.  The interpreting radiologist noted the marker might cause minimal deformity of the underlying deltoid muscle. The AC joint was normal and there was a type II acromion process with mild lateral down sloping.  No significant glenolhumeral joint effusion was identified; and the supraspinatus and infraspinatus tendons demonstrated areas of mild signal increase, which might reflect mild tendinosis. (Exhibit 1F).

The claimant saw Dr. Harrison initially on September 24, 2009, for her left shoulder pain, which she rated a 10/10.  The physical exam was

positive for pain on palpation and range of motion of the left shoulder. Dr. Harrison refilled her Ketoprofen, Diazepam and Tramadol tor left shoulder pain.  (Exhibit 6F).

The claimant was initially seen by Stephen B. Cope, MD, an orthopedist, for left shoulder pain on October 5, 2009.  Dr. Cope noted the claimant was involved in an MVA in January 2007, and has had intermittent problems with the left shoulder since then.  She stated that she has noted a small mass on the posterior left shoulder since that time that has not enlarged, but has caused some pain in the left shoulder.  Dr. Cope noted the claimant has never had any therapy or any real treatment to address the left shoulder complaints.  On physical exam, the claimant had full cervical motion.  She had no tenderness at the AC joint; but Dr. Cope said there was a small mobile apparent lipoma in the posterior superior aspect of the shoulder.  She has a full range of motion of the shoulder, but a positive impingement sign.  Dr. Cope noted she had a lot of pain on testing of the supraspinatus, but appeared to have normal strength of supraspinatus and internal/external rotation.  The lift-off test was negative, and the neurologic examination of the upper extremity was normal.  Dr. Cope noted that x-rays of the left shoulder taken at the exam were unremarkable.  He also noted the MRI scan report showed an apparent lipoma, but otherwise maybe just some tendinosis about the supraspinatus and infraspinatus. Dr. Cope assessed the claimant with subcutaneous lipoma left posterior shoulder and rotator cuff tendinitis.  He planned to try the claimant on Aleve and physical therapy. (Exhibits 2F and 5F).

The claimant attended 6 physical therapy sessions between October 7-21, 2009.  The physical therapist noted at her initial visit that she had 4-/5 muscle strength on the left shoulder and 5/5 on the right.   There was tenderness in the subacromion space of the left shoulder, which was treated with Ketoprofen **via iontophoresis.  On October 21, 2009, the physical therapist noted the** claimant had made improvements in range of motion in the left shoulder.  However, the claimant still had some pain and inflammation in the anterior shoulder.  She reported still having trouble with reaching overhead, picking up her child and sleeping comfortably; however, she stated she had seen improvements in these functional areas since therapy started.  Her pain level was a 4/10 at this visit.  (Exhibit 3F).

The claimant returned to Dr. Cope on November 2, 2009, and stated that the modalities and therapy all tended to aggravate her shoulder. He noted the claimant also now complained of significant pain in her

neck radiating into the scapula and even down into the left arm and hand, "·which is somewhat new." She stated that the shoulder keeps her from working, but now she is having significant neck pain. The physical exam showed full cervical motion. She had pain on range of motion of the left shoulder with a positive impingement sign. She had normal strength of the rotator cuff, but had a lipoma on the posterior aspect of the shoulder. Dr. Cope decided to order an MRI of the cervical spine due to the radicular pain complaints. (Exhibit 5F).

The claimant had the cervical spine MRI on November 4, 2009, which Dr. Cope interpreted as negative. The MRI report indicated that it showed mild reversal of the normal cervical lordosis, likely due to patient positioning, and minimal disc protrusion at T1-2 of doubtful clinical significance (*See* Exhibit 3F). Dr. Cope offered the claimant an injection in the subacromial space, and commented that he did not see anything that would be helped significantly by surgery at that point. The claimant returned on November 10, 2009, for a follow up of her neck and shoulder. Dr. Cope again noted the MRI of her cervical spine was negative, but she still had pain in her shoulder. The physical exam showed full motion and normal strength. She had a lipoma posterolaterally; but Dr. Cope said he did not think this was the source of her pain. However, he told the claimant the only other option would be to excise it. He gave her an injection of the subacromial space with Aristospan and Xylocaine, and told her to return for follow up as needed. She was a no-show for her December 7, 2009, appointment. (Exhibit 5F).

The claimant did not return to Dr. Cope until June 17. 2010, when she stated that she would like to have the mass excised in the posterior superior aspect of the left shoulder. Dr. Cope noted the previous MRI showed what was compatible with subcutaneous lipoma. The claimant followed up after her excision procedure on July 19, 2010, and Dr. Cope noted it was confirmed to be a lipoma by pathologic examination. Dr. Cope said the claimant was doing well, and had no swelling about the incision site, which was well healed, clean and dry. He told the claimant to return for follow up as needed. (Exhibit 8F).

On December 7, 2009, Gregory K. Parker, MD, a State agency internal medicine consultant, completed a Physical Residual Functional Capacity Assessment, and noted medically determinable impairments of rotator cuff tendinitis, subcutaneous lipoma left posterior shoulder and hypertension. Dr. Parker found that the claimant was capable of the following in an eight- hour workday: lifting and/or carrying 20 pounds

occasionally and 10 pounds frequently; standing and/or walking for a total of about 6 hours per day; sitting for about 6 hours per day; performing limited pushing and/or pulling in the upper extremities and unlimited pushing and/or pulling in the lower extremities; reaching with the right upper extremity without limitation reaching with the left shoulder occasionally; and handling (gross manipulation), fingering (fine manipulation) and feeling (skin receptors) without limitation. Dr. Parker said the claimant should avoid concentrated exposure to extreme cold, extreme heat and hazardous machinery and heights; but could be exposed to wetness, humidity, noise, vibration, fumes, odors, dusts, gases and poor ventilation without limitation. Dr. Parker noted he assigned the limitation to occasional reaching with the left shoulder due to pain. (Exhibit 4F).

In terms of the claimant's alleged history of subcutaneous lipoma left posterior shoulder, the claimant underwent successful surgical removal of the lipoma. Dr. Cope noted the claimant did well after her excision procedure, and told her to follow up as needed. (Exhibit 8F). However, the claimant sought no further treatment from Dr. Cope or any other orthopedic specialist for her shoulder problems.

Additionally, the objective evidence regarding the claimant's left shoulder revealed minimal findings in most instances. The MRI **of the left shoulder on September 18, 200, showed** findings suggestive of a subcutaneous lipoma, which was later surgically removed. Otherwise, there was a question of *mild* supraspinatus and infraspinatus tendinosis. (Exhibit 1F). Dr. Cope said the claimant's cervical spine MRI on November 4, 2009, was negative, and showed nothing that would be helped by surgery. (Exhibit 5F). The MRI report showed *minimal* disc protrusion at T1-2 of doubtful clinical significance. (Exhibit 3F).

At the December 20 2011, hearing, the claimant testified that she has burning and tingling, and really cannot use the left arm. However, this allegation is not supported by the medical evidence of record. The physical exams consistently show no neurological deficits. (Exhibits 2F, 5F, 6F, 10F, 19F 20F, 23F, 24F and 28F). The claimant told Dr. Cope that she had *intermittent* problems with her left shoulder since her 2007 MVA (*See also* Exhibit 20E). **On physical exam, the** claimant had full cervical motion and no tenderness at the AC joint. While Dr. Cope also noted she had a positive impingement sign, she had full range of motion of the shoulder and what appeared to be normal strength. Dr. Cope also noted that x-rays of the left shoulder taken at the exam were u n remarkable. (Exhibits 2F and 5F). The claimant's physical therapy records document only a slightly diminished muscle strength of 4-/5 on

the left shoulder. (Exhibit 3F). Her muscle strength in the upper extremities was 5 / 5 in January 2010 and November 2011. (Exhibit 6F and 20F).

The claimant also related at the December 20, 2011 hearing that she went to the emergency room recently, and found out that her left arm complaints are starting to happen in her right arm as well. She testified that she was told she needs to see a neurologist and an orthopedist. However, the record shows that she presented to the emergency room on November 18, 2011, complaining of right shoulder and neck pain since earlier that night. She denied injury, but had extreme tenderness to palpation of the right shoulder, limited range of motion of the right arm and weak grips. The emergency room note reflects that she was told to go by Dr. Harrison's office and request a referral to USA neurosurgery. The emergency room physician noted she reported that her MRI showed disc "bulges," and she was diagnosed with cervical disc displacement. The emergency room physician, however, noted that she needs to have a neurosurgeon review her MRI to determine the significance of the disc displacement. (Exhibit 20F). Yet as noted previously, the MRI of the claimant's cervical spine showed only a *minimal* disc protrusion at T1-2 of doubtful clinical significance. (Exhibit 3F). The claimant returned to Franklin on November 28, 2011, and requested a referral to a neurologist. (Exhibit 22F). At this time, the claimant was referred to Dr. Hewitt, who found the NCS showed no abnormality. (Exhibit 23F).

Given the claimant's history of subcutaneous lipoma left posterior shoulder with subsequent excision, the undersigned finds that she is capable of lifting/carrying up to 10 pounds frequently and 20 pounds; occasionally; using the left hand for reaching (including overhead) occasionally; and for handling, fingering and feeling without limitation; performing limited pushing and/or pulling with the upper extremities; and using the right hand for reaching (including overhead), handling, fingering and feeling without limitation. However, no greater limitation is warranted due to the overall minimal objective findings. The undersigned has accounted for her complaints of difficulty using and lifting the left arm with the restriction to only occasional reaching with the left upper extremity.

The claimant has degenerative disc disease and cervical and lumbar radiculopathy, which results in the limitation on her ability to lift/carry up to 10 pounds frequently and 20 pounds occasionally; sit for about 6 hours per day; stand and/or walk for up to 6 hours per day; perform pushing and/or pulling with the lower extremities without limitation;

and climb stairs and ramps, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch and crawl without limitation.

The claimant went to Franklin on December 17, 2009, for left shoulder and back pain related to her MVA. She also reported having migraines since the 2007 MVA, and reported that she suffered a whiplash injury. It was noted that the left shoulder MRI was negative per Dr. Cope. The physical exam showed tenderness in the cervical and lumbar spine with the SLR performed to 90 degrees. She was diagnosed with a cervical strain and arthralgia, and was prescribed Meprobamate, Ketoprofen, Neurontin and Elavil. She was also told to engage in aerobic exercise. (Exhibit 6F).

The claimant saw a nurse practitioner at Franklin on January 20, 2010, for a follow up on her back and neck pain. She reported having another MVA 6 days ago resulting in left shoulder and neck pain, but she did not go to the emergency room. She rated her pain a 7/10. The physical exam showed tenderness along the left shoulder and back of neck, but 5/5 *muscle* strength in the upper extremities. X-rays were ordered, and she was told to continue taking her Neurontin, Meprobamate and Amitriptyline daily. (Exhibit 6F).

She returned to Franklin on February 10, 2010, for medication refills, and requested that her Social Security form be completed. Her treatment provider's name was not legible, but he or she noted, "I see no restrictions preventing work." The physical exam showed full range of motion, no tenderness to palpation and no visible abnormalities. She was diagnosed with residual pain, 3 years post whiplash, with negative x-rays and negative exam. She was told to continue Elavil and was given Zanaflex and lndocin. (Exhibit 6F).

She saw Dr. Harrison on February 15, 2010, for increased back pain and a knot on her left shoulder. She rated her pain a 10/10. She complained of having migraines and left side spasms. She was diagnosed with low back pain and bilateral knee pain, migraines, left shoulder pain, left shoulder lipoma, and fatigue. Dr. Harrison prescribed Neurontin, Fioricet, Topamax and Amitriptyline for sleep, and ordered a lipid screen due to fatigue complaints. She followed up on March 9. 2010, and Dr. Harrison noted she rated her pain a 10/10. The physical exam showed pain on range of motion of the cervical spine and left shoulder with pain on palpation of the cervical spine. (Exhibit 6F).

On April 14, 2010, Dr. Harrison noted the claimant continued to complain of left shoulder, neck and lower back pain and migraines. The physical exam showed pain with range of motion of the cervical and lumbosacral spine. Dr. Harrison assessed her with cervical radiculopathy, lumbar radiculopathy, left shoulder pain and migraine headaches. He prescribed Darvocet, Neurontin and Topamax. (Exhibit 6F).

The claimant reported that her pain medication was not working during her July 7, 2010, follow up, so Dr. Harrison prescribed Lortab 10. The physical exam was positive for pain the neck. He gave her Lortab as needed for DDD of the cervical spine, Elavil for insomnia and Valium as needed for muscle spasm. He noted no abnormalities on physical exam; and the claimant reported her pain was a 5/10. (Exhibit 9F). Dr. Harrison refilled her medications on October 26, 2010. She reported pain that was a 9/10, and complained of neck pain and muscle spasm. The physical exam was positive for pain over the cervical spine on range of motion: but no other physical exam abnormalities were noted. Dr. Harrison sent the claimant to Robert C. Calin, MD, a anesthesiologist on November 8, 2010, for pain management with a left C5-6 and C6-7 epidural block (See Exhibit 13F). Dr. Harrison's January 19, 2011, reflected no changes, except her Topamax was also refilled for headache. (Exhibit 12F).

The claimant saw Dr. Harrison March 18, 2011, and reported her pain was a 1/10. However, she stated that her medication was not helping and the epidural did not help. Dr. Harrison noted her general appearance was normal but she had pain on range of motion over the cervical spine area. Dr. Harrison continued her on Lortab as previously prescribed, ordered a repeat MRI and referred her to a neurosurgeon. (Exhibit 12F).

The claimant underwent the MRI on March 29, 2011, which showed mild degenerative changes of the cervical spine. The interpreting radiologist noted he compared the findings to the previous MRI dated March 17, 2010. The radiologist found the claimant's vertebral body heights and alignment appeared maintained. There was no fracture or subluxation; and there was no abnormal signal seen within the cord. Mild osteophytic changes and mild disc bulging was seen at C5-C6 and C6-C7, with no significant areas of canal stenosis and no neural foraminal narrowing present. There did not appear to be abnormal enhancement following the administration of intravenous contrast; and the remainder of the examination appeared unremarkable. (Exhibit 14F).

On May 5, 2011, the claimant followed up with Dr. Harrison for her left shoulder pain, and rated her pain an 8/10. Her general appearance was normal; but the physical exam again showed pain over the cervical spine. Dr. Harrison refilled her Lortab for pain and Valium for muscle spasm to be taken as needed. Dr. Harrison prescribed Lexapro on June 1, 2011, and diagnosed her with anxiety and depression. At this visit, she complained of an anxiety attack, and followed up with Dr. Harrison after going to the emergency room and being diagnosed with anxiety and depression. No physical exam abnormalities were reported. On August 22, 2011, the claimant reported her pain was a 10/10, and Dr. Harrison noted pain with range of motion in the cervical spine. He continued her on her pain medications as previously prescribed. (Exhibit 15F).

The claimant underwent a consultative exam with Thomasina Sharpe, MD, a family practitioner, on August 27, 2011. Dr. Sharpe noted the claimant's chief complaints included spinal problems causing left arm, back and neck pain. Dr. Sharpe noted the claimant's symptoms began in 2007 when she had a car accident and went to the emergency room. She was diagnosed with injury to neck and left side bruise. She continued to have neck pain, and then had second MVA in January 2010, and was hit on driver side. The claimant reported this worsened her neck, and she started to have left arm and shoulder pain. The claimant also stated that she had a knot surgically removed from her shoulder in November 2010, which she said was a "Lymph node." She had physical therapy and modalities. She denied neck/back surgery, but said she had one epidural that did not help. The claimant said she now goes to pain management. (Exhibit 18F).

Dr. Sharpe noted the claimant "manages activities of daily living and instrumental activities of daily living; sweeping, washing dishes and making the bed." The claimant reported that she was then taking Gabapentin (1-2 a week), Lortab (3 a week), Diazepam (3-4 a week), Topiramate (3-4 weekly). Amitriptyline (1-2 a week), Amlodipine (nightly), Lexapro (daily) and Simvastatin (nightly). Her past medical history was also significant for hypertension and hyperlipidemia. The claimant was living with her children and her children's grandmother. Dr. Sharpe noted the claimant's only hospitalization in the last 2 years was for an ectopic pregnancy in 2010 (*See* Exhibit 10F). She reported going to the emergency room in the last 2 years for anxiety attack. (Exhibit 18F).

Dr. Sharpe noted the claimant was in no acute distress, and was able to get up and down off the exam table without difficulty, and took her shoes and socks off and on without difficulty. The claimant is 5'8'" tall and weighed 158 pounds. Her blood pressure was 137/88. Her vision was 20/15 in the left eye and 20/15 in the right eye without correction. Her pupils were equal, round and reactive to light and accommodation. Extraocular movements were intact. Her lungs were clear to auscultation throughout. Her heart had a regular rate and rhythm. Pulses were 2+ and equal throughout. The claimant's gait was normal. There was no Romberg present. She had normal heel-shin, toe-heel and tandem gait. She did not use or need an assistive device. (Exhibit 18F).

Dr. Sharpe reported the claimant had slightly diminished range of motion in the cervical region with flexion 0-45 degrees, extension 0-50 degrees, lateral flexion 0-40 degrees and rotation 0-70 degrees bilaterally; in the lumbar region with flexion 0-80 degrees, backward extension 0-20 degrees and lateral flexion 0-20 degrees bilaterally; in the hip joints with rotation-internal 0-20 degrees, rotation-external 0-30 degrees, abduction 0-25 degrees and adduction 0-15 degrees bilaterally; in the knee joints with flexion 130 degrees bilaterally; and in the finger thumb joints with flexion/extension or the proximal phalanx 70 degrees and distal phalanx 90 degrees bilaterally. The claimant's range of motion in the hips was otherwise normal with forward flexion 0-100 degrees and backward extension 0-30 degrees. Her ankle joints had full range of motion with dorsiflexion 0-20 degrees and plantar flexion 0-40 degrees bilaterally. Other than some slightly decreased range of motion in the elbow joints with flexion 0-140 degrees, she otherwise had full motion with supination 0-80 degrees and pronation 0-80 degrees. Her wrist joints had full range of motion with extension 0-60 degrees, flexion 0-60 degrees, radial deviation 0-20 degrees and ulnar deviation 0-30 degrees bilaterally. Dr. Sharpe noted the claimant gave poor effort with left arm, but with coaching, she had decreased range of motion with forward flexion 0-130 degrees and extension 0-40 degrees; but had normal range of motion with abduction 0-150 degrees, adduction 0-30 degrees, internal rotation 0-90 degrees and external rotation 0-90 degrees bilaterally. The straight leg raise (SLR) was negative. Dr. Sharpe noted the claimant had 5/5 muscle bulk, strength and tone; and there was no atrophy. Bilateral grip strength was 5/5. The sensory exam showed light touch and pinprick was intact throughout the upper and lower extremities. Deep tendon reflexes were 2+ and equal in the bilateral upper and lower extremities. The cranial nerves were intact. Dr. Sharpe diagnosed the claimant with neck and back pain with left arm radiculopathy. (Exhibit 18F).

Dr. Sharpe also completed a Medical Source Statement (MSS) of Ability To Do Work-Related Activities (Physical) Form, and found the claimant could do the following activities in an 8-hour work day: lift/carry up to 10 pounds frequently and 20 pounds occasionally: sit for 2 hours at a time, for up to 6 hours per day; stand for 1 hour at a time, for up to 3 hours per day: walk for 1 hour at a time, for up to 3 hours per day; use the right hand for reaching overhead, all other reaching, handling, fingering, feeling and pushing/pulling continuously; use the left hand for reaching overhead, fingering and feeling continuously; use both feet for repetitive movements as in operation of foot controls occasionally; climb stairs and ramps and climb ladders or scaffolds occasionally; and balance, stoop, kneel, crouch and crawl frequently. Dr. Sharpe said the claimant can be exposed to unprotected heights, moving mechanical parts and operating a motor vehicle frequently; and assigned no limitations regarding exposure to humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat and vibrations. Dr. Sharpe assigned the lifting/carrying restrictions due to limiting pain and decreased range of motion; the sitting, standing and walking restrictions, manipulative restrictions, postural restrictions and pushing/pulling with the feet restrictions due to pain; and the environmental limitations due to pain, range of motion and side effects to pain medications. Dr. Sharpe noted **the claimant did not** require the use of a cane to ambulate. Based solely on the claimant's physical impairments, Dr. Sharpe opined that she is capable of performing activities like shopping; traveling without a companion or assistance; ambulating without using a wheelchair, walker or 2 canes or 2 crutches; walking a block at a reasonable pace on rough or uneven surfaces; using standard public transportation; climbing a few steps at a reasonable pace with the use of a single hand rail; preparing a simple meal and feeding herself; caring for personal hygiene; and sorting, handling and using paper/files. (Exhibit 18F).

The claimant followed up with Dr. Harrison on September 28, 2011, and reported her pain was a 5/10. Again, pain with range of motion was noted over the cervical spine. Her medications were refilled as previously written. (Exhibit 22F).

As noted above, the claimant went to the emergency room on November 18, 2011, for right shoulder and arm pain. She reported the pain is similar to the pain she experiences in her left shoulder from a herniated disc. She also complained of numbness and tingling down both arms and pain with active movement of the shoulders radiating up

the neck.  The physical exam showed full range of motion in the neck with tenderness over the trapezius muscle bilaterally.

The back exam showed no deformities.   The neurological exam revealed no focal deficits, 2/4 deep tendon reflexes, and 5/5 muscle strength bilaterally.  She was diagnosed with cervical disc displacement and hypertension, not otherwise specified (NOS), and was given prescriptions for Mobic, Prednisone, Lyrica and Lortab.  (Exhibit 20F).

The claimant saw a physician's assistant at Franklin on November 28, 2011, for follow up and a referral to see a neurologist.  She reported her pain was a 6/10.   She reported that she went to the hospital on November 18, 2011, for pain on the right side.  She said she was advised to see a neurologist, and was given Lyrica for pain.  She reported that she has been having lightheaded episodes.   Her heart, lungs and abdominal exams were normal; but the claimant had pain in the back and down the arms.  She was assessed with muscle spasm, and was referred for a NCS.  Her current medication regiment was continued as previously     prescribed     for     her     DDD,     hypertension     and hypercholesterolemia.  (Exhibit 22F).

Dr. Harrison sent the claimant for a NCS on December 1, 2011 and Dr. Hewitt found no abnormalities whatsoever.  Dr. Hewitt's impression was that this was a normal NCS.  He noted there was no evidence or a median neuropathy on either side or of a left ulnar neuropathy. (Exhibit 23F).

The claimant returned to the emergency room on January 8, 2012, complaining of neck pain and left wrist pain after falling the night before.  **She reported having a history of cervical disc** disease and fibromyalgia. She complained of "swelling'" to the left deltoid area, but denied numbness/tingling.  The physical exam showed spasms over the left deltoid; but the extremities had no clubbing, cyanosis or edema.  She had 2+ radial pulses and no obvious deformity, but there was decreased range of motion of the wrist secondary to pain.  The neurological exam showed no focal deficits.  The claimant reported that she felt better after receiving Nubain and Decadron.  She was diagnosed with chronic neck pain secondary to disc disease, deltoid muscle spasms, hypertension and hyperlipidemia.  She was given Norflex to use for muscle spasms.  X-rays of the left wrist were unremarkable.  The cervical spine x-rays showed straightening of the normal cervical lordosis, but no disruption of the anterior or posterior spinal lines.  There was no prevertebral soft tissue swelling.   No definite fracture was seen in the cervical spine. (Exhibit 24F).

The claimant saw Dr. Harrison on March 1, 2012, complaining of back pain and to have a Functional Capacity Evaluation completed. The physical exam again showed pain with range of motion in the cervical spine. At this visit, the claimant reported her pain was an 8/10. Dr. Harrison assessed her with "Functional Capacity Evaluation," hypertension, hypercholesterolemia, muscle spasms, DDD of the cervical spine, neuropathy and insomnia. He instructed the claimant to continue her current treatment. (Exhibit 28F).

Dr. Harrison ordered an MRI of the lumbar spine on March 12, 2012, which showed a right paracentral posterior disc protrusion worrisome for the presence of disc herniation at L5-S1. The disc protrusion was not significantly affecting the thecal sac or neural foramina. The remainder of the included disc spaces were without significant finding, and the facet joints appeared grossly unremarkable. (Exhibit 29F).

In terms of the claimant's alleged degenerative disc disease of the spine and lumbar radiculopathy, the claimant has received essentially routine, conservative treatment. The claimant's physical exams from Franklin generally show some spinal tenderness, left shoulder with pain on palpation of the cervical spine and/or pain with range of motion in the cervical and/or lumbar spine. (Exhibits 6F, 12F, 15F, 22F and 28F). The physical exam from the claimant's emergency room visit on November 18, 2011, showed full range of motion in the neck with tenderness over the trapezius muscle bilaterally, but no deformities of the back, no focal neurological deficits, and 5/5 muscle strength bilaterally. (Exhibit 20F). Dr. Harrison has prescribed Lortab to be used on an as needed basis only. (Exhibits 22E, 25E, 29E, 12F, 15F, 20F, 22F and 28F). The claimant also told Dr. Sharpe that she was taking only 3 Lortab a week during her consultative exam. (Exhibit 18F).

Additionally, the objective evidence reveals minimal findings in most instances. Dr. Cope said the claimant's cervical spine MRI on November 4. 2009, was negative, and showed nothing that would be helped by surgery. (Exhibit 5F). The MRI report showed *minimal* disc protrusion at T1-2 of doubtful clinical significance. (Exhibit 3F). The claimant's x-rays were noted to be negative at Franklin on February 10, 2010. (Exhibit 6F). The March 29, 2011, cervical spine MRI showed *mild* degenerative changes of the cervical spine noted as *mild* osteophytic changes and mild disc bulging was seen at C5-C6 and C6-C7. (Exhibit 14F). The December 1, 2011, NCS showed no abnormalities whatsoever. (Exhibit 23F). The cervical spine x-rays taken in the emergency room on January 8, 2012, showed straightening of the normal cervical lordosis, but no other abnormalities. X-rays of the left wrist were also unremarkable. (Exhibit 24F). The March 12, 2012, MRI of the lumbar

spine showed a right paracentral posterior disc protrusion **worrisome** for the presence of disc herniation at L5-Sl; yet, the disc protrusion was not significantly affecting the thecal sac or neural foramina. The remainder of the included disc spaces were without significant finding, and the facet joints appeared grossly unremarkable. (Exhibit 29F).

The claimant has reported daily activities that are limited to a varying degree. In a Pain Questionnaire completed on May 17, 2010, the claimant said her activities have changed since her left arm, neck and lower back pain began in July 2007. She reported changes related to the use of her left arm, holding her head down for long periods and spending time outside with her children. However, she reported her daily activities included household chores, outside chores, doing hair and driving. (Exhibit 13E). The claimant is apparently able to care for her children at home with some assistance from her older children. The claimant also completed a Function Report on May 17, 2010, and reported that on a typical day, she gets her children ready for school, cleans up as much as she can, walks for about 15 minutes, gets her children from school, cooks with help from her oldest child, and does homework before getting her children ready for bed. She takes care of her children. She reported some difficulties with personal care, including difficulty putting on shirts, using her left arm for a long period of time to care for hair and inability to pick up heavy things while doing outside work. She said she goes outside every day, walks and drives a car. (Exhibit 12E).

The claimant testified that she lies around all day because of her medication. She said her oldest daughter and son help her cook, as she is not able to cook or clean on her own. She also said she does no cleaning and has to have help getting dressed. However, she said she is able to bathe herself without help.

The claimant testified that she has various medication side effects. She said Amitriptyline causes itching, but "it helps a lot." She commented that she thinks Lyrica causes some kind of stomach discomfort. The previously reported in a Pain Questionnaire that she has medication side effects including weight gain, constipation, drowsiness, blurred vision, dry mouth and tiredness. (Exhibit 13E). However, she reported no side effects to these medications in her June 16, 2010, Disability Report. (Exhibit 20E). Although the claimant has alleged various side effects from the use of medications, the medical records, such as office treatment notes, do not corroborate those allegations. There is no supporting evidence that the medications prescribed for the claimant have the incapacitating side effects to the extent that she described. Therefore, the undersigned does not find that this allegation has been established as an actual 12-month functional work-related limitation.

The claimant also testified at the most recent hearing that Dr. Harrison prescribed a cane to help with her balance due to problems with her hip "slipping ... and it catches in my leg and my lower back." The record reflects that Dr. Harrison prescribed the claimant a cane with instructions to use as directed on March 1, 2012. Dr. Harrison noted ICD9 diagnosis code 719.7, which corresponds with the diagnosis of effusion of joint, ankle and foot. (Exhibit 26F). However, the undersigned notes that none of Dr. Harrison's treatment records include notations for balance problems, that she is prone to falls or complaints of hip symptoms as described at the hearing. (Exhibits 6E 9F.12F, 15F, 22F and 28F). In fact, Dr. Harrison indicated that she is not prone to falls during the March 1, 2012, physical exam. He diagnosed her with neuropathy at this visit, but did not indicate any neurological abnormalities on physical exam. (Exhibit 28F).

The claimant testified at the December 2011, hearing that she was recently put on Lyrica for fibromyalgia. However, the record does not reflect that she carries this diagnosis. On September 12, 2009, Dr. Lawrence, a rheumatologic specialist, noted the review of systems was negative for any signs of a connective tissue disorder (*See* Exhibit 6F), and Dr. Lawrence never diagnosed the claimant with fibromyalgia. Likewise, Dr. Harrison has not diagnosed the claimant with fibromyalgia. The claimant testified that she was diagnosed with fibromyalgia by an emergency room doctor; however, the emergency room records from November 18, 2011, show she was diagnosed with cervical disc displacement and hypertension, NOS. (Exhibit 20F). The claimant returned to the emergency room on January 8, 2012, complaining of neck pain and left wrist pain after falling the night before. At this visit, she *reported* having a history of fibromyalgia; but the claimant was not diagnosed with fibromyalgia at that time. (Exhibit 24F).

The undersigned finds that she is capable of lifting/carrying up to 10 pounds frequently and 20 pounds occasionally; sitting for about 6 hours per day; standing and/or walking tor up to 6 hours per day; performing pushing and/or pulling with the lower extremities without limitation; and climbing stairs and ramps, climbing ladders/ropes/scaffolds, balancing, stooping, kneeling, crouching and crawling without limitation.

The undersigned notes the claimant testified at the December 20, 2011 hearing that she has had no mental health treatment; however, she reported that she has had anxiety attacks. She said she went to the emergency room tor an anxiety attack once in the past. She said she

had another anxiety attack in October, but her family was around and calmed her down. She takes Valium, which Dr. Harrison told her was "like a depression medication," but he also prescribes this for muscle spasm. The claimant stated that she was on Lexapro at one time, but it caused a lot of discomfort. She reported that she was "on a lot of different medications" at that time, so Dr. Harrison preferred to just keep her on Valium. The claimant said she has not been referred to mental health for evaluation and treatment.

On June 16, 2010, the claimant reported, "I stay depressed and it is very painful." (Exhibit 20E). However, the claimant told a DDS representative on June 8, 2010, that she is not alleging mental illness, and reported that she takes Amitriptyline at night because of her pain. (Exhibit 15E). Indeed, the claimant has been prescribed several medications that are indicated for depression and/or anxiety treatment. However, the medical evidence of record documents that she has been prescribed Valium for muscle spasm (*See* Exhibits 6F, 9F and 15F); Meprobamate for cervical strain (*See* Exhibit 6F); and Amitriptyline for pain/sleep (*See* Exhibits 6F and 9F).

The claimant has hypertension, which results in the limitation on her ability to work in a job environment that would allow her to avoid concentrated exposure to extreme heat, extreme cold, hazardous machinery and heights.

The medical evidence of record from Franklin documents sporadic elevations in blood pressure during the relevant period of adjudication. (Exhibits 6F, 10F, 15F and 16F). The claimant has also complained of chest pain in the emergency room. The claimant complained that her heart was "fluttering" with dizziness and increased blood pressure on May 27, 2011. Her blood pressure was 142/80. An EKG showed sinus rhythm and abnormal Q wave suggestive of anterior infarct. Yet, she was treated with aspirin, Nitroglycerin and Morphine, which improved her condition. (Exhibit 16F). She was transferred to the cardiac unit, and was ultimately diagnosed with atypical chest pain and chronic back pain and left arm pain. Her cardiac enzymes were normal, and a repeat EKG was borderline, with probable left atrial abnormality. She was counseled on good eating habits, stress relief with relaxation exercises and drinking plenty of fluids. (Exhibit 17F).

The claimant was started on Norvasc for hypertension by a nurse practitioner at Franklin on July 25, 2011. She also complained of headaches, but no dizziness, blurred vision, chest pain or shortness of breath. No physical exam abnormalities were noted, except her blood

pressure was 141/93.  She was also prescribed Zocor due to high cholesterol on July 26, 2011.  Her blood pressure was 120/72 during her August 22, 2011, follow up visit, and has remained within normal limits since then, and she has had no complications.  (Exhibits 19F, 22F and 28F).

The claimant's diagnosed hypertension has been shown to respond well to properly administered conservative treatment, and the record contains no indication of end-organ damage causing significant functional impairment of the heart, kidneys and eyes, such as hypettensive cardiovascular disease, hypertensive nephropathy or retinopathy.  The undersigned finds that she is capable of working in a job environment that would allow her to avoid concentrated exposure to extreme heat, extreme cold, hazardous machinery and heights.

The claimant also has history of headaches, which results in the limitation on her ability to work in a job environment that would allow her to avoid concentrated exposure to extreme heat, extreme cold, hazardous machinery and heights; and perform unskilled work.

The claimant completed a Headache Questionnaire on May 17, 2010, and reported having *severe* headaches 2-3 times a week, but daily headaches.  She said her headaches are always on the left side of her head, and it makes her stomach hurt.  She said the headaches sometimes last all day. She has been having headaches since 2007-2008, and they are occurring more frequently.   She reported no after effects of her headaches, but being in hot places or under stress causes headaches.  She reported that her medications, Butalbital and Topiramate, relieve her headaches, but cause constipation, dry mouth, drowsiness and loss of appetite.   She has not required emergency room treatment for her headaches.  (Exhibit 14E).  The undersigned notes that she reported no side effects to these medications on June 16, 2010.  (Exhibit 20E).

The claimant said she takes Topamax for migraines, which she has had since 2007.  The claimant said she has maybe 2 migraines a week, which last about 5 hours.   She said she has to lie down when she gets a migraine due to the headache and accompanying nausea and dizziness. She related that she used to have more headaches when it is hot outside. She rated her headache pain as a 10/10 on the pain scale (0 = no pain, 10 = worst possible pain), and said she cannot concentrate during headaches.

In terms of the claimant's alleged history of headaches, the claimant has been prescribed and has taken appropriate medications for headaches at Franklin, which weighs in the claimant's favor, but the medical records reveal that the medications have been relatively effective in controlling

the claimant's symptoms.  Although the claimant testified that she has headaches 2-3 times a week, she has not required emergency room treatment tor her headaches, and did not complain of headache symptoms occurring to this degree during her visits to Franklin.  However, based on the fact that she has been prescribed medications for migraines, the undersigned finds that she is capable of working in a job environment that would allow her to avoid concentrated exposure to extreme heat, extreme cold, hazardous machinery and heights.  The undersigned also finds that the claimant is capable of performing unskilled work based on her testimony that she has problems concentrating when she has a headache.  The undersigned further notes that unskilled work is appropriate based on her education level.  She testified that she quit school after the 10th grade, and passed all sections of the GED exam except math.  However, the claimant said she can read, write and perform simple math calculations.

The undersigned notes the claimant has made several inconsistent statements regarding matters relevant to the issue of disability that supports the finding that she is less than fully credible.

The claimant told Dr. Cope that the modalities and physical therapy all tended to aggravate her shoulder.  (Exhibit 5F).  However, her physical therapy noted at her last visit that the claimant stated she had seen improvements since therapy started, and her pain level had decreased.  (Exhibit 3F).

When asked at the December 2011, hearing if any physician has advised the claimant to exercise, the claimant responded "no one has ever told me to exercise because if I do a lot, it causes pain and runs my blood pressure up."  However, treatment records from Franklin in Exhibit 6F note that she was instructed to exercise.

The claimant testified that she was on Lexapro at one time.  However, she was "on a lot of different medications" at that time, so Dr. Harrison preferred to just keep her on Valium.  The claimant also said she was on Neurontin in the past, but was changed to Lyrica because "it is better for my nerves."  Yet the emergency room record from November 18, 2011, reflects that she was prescribed Lyrica "since off Neurontin," and that she reported that she was off Neurontin due to "too much med[ication]."  (Exhibit 20F).

The undersigned also notes that the claimant testified that she was initially turned down for Medicaid when she first applied because she was working.  The claimant said she then found out that she could get Medicaid if she stopped working.  She said she reapplied and was granted insurance after she stopped working.  Therefore, this could have influenced her decision, at least in part, to stop working.  Indeed,

her motivation to work was questioned by her treatment provider at Franklin on February 10, 2010, when she requested that her Social Security form be completed.  However, her treatment provider noted that a specific concern was "motivating [the claimant] to work post pain [with] absence of any sig[nificant] pathology ... certainly no disabling path[ology] found." (Exhibit 6F).

As for the opinion evidence, the undersigned notes that Dr. Harrison, the claimant's treating physician, has offered several opinions regarding her functional abilities and limitations.  However, no significant weight is given to his opinion in Exhibits 7F, 11F and 27F, for the reasons discussed below.

On April 26, 2010, Dr. Harrison completed a Clinical Assessment of Pain (CAP) Form, and noted the claimant's pain is present to such an extent that bed rest is necessary; physical activity, such as walking, standing, bending, stooping and moving of the extremities, would increase symptoms to such an extent that bed rest is necessary; and pain impacts the individual's ability to perform her previous work to the extent that the claimant will be totally restricted and thus unable to function at a productive level of work.  Dr. Harrison noted that he had treated the claimant since September 2009, and the MRI of her neck showed disc bulging at C5-6 and C6-7, which is the underlying cause of her pain.  Dr. Harrison noted the claimant was prescribed narcotic pain medication, Darvocet and will require pain management in the next year.  Dr. Harrison did not answer the question regarding whether the claimant could engage in any form of gainful employment on a consistent basis without missing more than 2 days of work per month or frequent interruptions to her work routine; but he did note she complains of pain. (Exhibit 7F).

The undersigned gives no weight to Dr. Harrison's responses in the CAP form for several reasons.  First, the course of treatment pursued by Dr. Harrison has not been consistent with pain to such an extent that bed rest is necessary.  While Dr. Harrison had been treating the claimant for less than a year when he completed the CAP, he noted her general appearance was normal on several occasions around the time he completed this form.   (Exhibits 6F and 9F and 12F). Despite his responses in the CAP, Dr. Harrison has prescribed Lortab to be used on an as needed basis only. (Exhibits 22E, 25E, 29E, 12F, l5F, 20F, 22F and 28F).  Second, his more recent treatment notes reflect no increase in dosage or frequency of administration of her medications prescribed for pain.  Third, Dr. Harrison identified the November 2009, MRI, which he said showed disc bulges at C5-6 and C6-7, as the underlying cause of her pain.   However, Dr. Cope, her former treating orthopedist interpreted this MRI as being negative *(See* Exhibit 5F); and the report of

the MRI from the radiologist does not mention issues at the C5-6 or C6-7 disc levels. (Exhibit 3F). Finally, the claimant's office visit on February 10, 2010, less than three months before Dr. Harrison completed the CAP form, shows that she requested that her Social Security form be completed. However, her treatment provider at Franklin said, "I see no restrictions preventing work." (Exhibit 6F).

Dr. Harrison later wrote a letter on March 18, 2011, stating that she was *currently* unable to work because of her medical condition. He noted the current therapy she has received has not controlled her symptoms, and she is currently being referred to another specialist. (Exhibit 11F). However, no weight is given to this letter because Dr. Harrison's own treatment note from this date fails to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, as Dr. Harrison reported. Specifically, the treatment note from this date reflected the claimant reported her pain was only a 1/10. He noted that her general appearance was normal; and she had pain on range of motion over the cervical spine area. While she stated that her medication was not helping and the epidural did not help, Dr. Harrison continued her on Lortab as previously prescribed. (Exhibit 12F). As noted previously, Dr. Harrison has also characterized her general appearance as "normal" no physical exam.

Dr. Harrison completed a Physical Capacities Evaluation (PCE) form on March 1, 2012, and found the claimant had the following limitations in an eight-hour workday: sit for 2 hours at a time, for up to 2 hours per day; stand/walk for 2 hours at a time, for up to 2 hours per day; lift up to 5 pounds for 1 hour during an 8-hour workday; carry up to 5 pounds for 2 hours during an 8-hour workday and up to 25 pounds for 1 hour during an 8-hour workday; bend, squat and crawl for up to 2 hours in an 8-hour workday; and climb for up to 1 hour in an 8-hour workday. Dr. Harrison assigned mild restriction of activities involving unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, driving automobile equipment and exposure to dust fumes and gases. Dr. Harrison said the claimant cannot reach; use her hands for repetitive action such as simple grasping, pushing and pulling of arm controls and fine manipulation; or use her feet for repetitive movements as in pushing and pulling of leg controls. Dr. Harrison did not answer the questions about the length of time the claimant has been impaired or whether she can work 8 hours per day, 40 hours per week on a sustained basis, within the limitations above, without missing more than 2 days of work per month. (Exhibit 27F).

The undersigned gives no weight to Dr. Harrison's PCE in Exhibit 27F because it is conclusory, internally inconsistent, and not supported by his own treatment records. In the PCE, Dr. Harrison found the claimant could sit for 2 hours at a time, for up to 2 hours per day and stand/walk tor 2 hours at a time, for up to 2 hours per day. Howvever,

he provided no explanation of the evidence relied on in forming that opinion: and as noted above, the claimant's physical exams from Franklin generally show some spinal tenderness, left shoulder with pain on palpation of the cervical spine and/or pain with range of motion in the cervical and/or lumbar spine. (Exhibits 6F, 12F, 15F, 22F and 28F). Additionally, some  of the limitations set forth in the PCE are internally inconsistent.  For example, he said the claimant could only lift up to 5 pounds, but was able to could carry up to 25 pounds.  Dr. Harrison also said the claimant cannot reach, but can climb for 1 hour a day.  He said the claimant cannot use her feet for pushing/pulling, but can bend, squat and crawl for up to 2 hours in an 8-hour workday.  Dr. Harrison also said she cannot use her hands for repetitive action such as simple grasping, pushing and pulling of arm controls and fine manipulation; however, she has received no significant treatment for problems with her hands that would affect her manipulative abilities during the period of adjudication.  The undersigned notes that Dr. Harrison assigned *mild* restriction of activities involving environmental irritants, which does not readily translate into vocational terms.

The undersigned notes that the possibility always exists that a treating physician may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.  While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.  Dr. Harrison 's opinion is without substantial support from the other evidence of record, which obviously renders it less persuasive.  Social Security Rulings 96-2p and 96-5p indicate that controlling weight may not be given to a treating physician's opinion unless it also is "not inconsistent" with the other substantial evidence in the case record. Therefore, Dr. Harrison's opinion cannot be given controlling weight.

The claimant's representative objected to Dr. Sharpe's consultative exam in a later dated September 15, 2011.   The claimant's representative argued that the report by Dr. Sharpe contains an explicit admission that no records were reviewed by Dr. Sharpe (*See* Exhibit 18F).  He noted the claimant informed him that the examination of the claimant by Dr. Sharpe lasted about 10 minutes.  The report stated that the claimant "takes shoes and socks off and on without difficulty." However, the claimant told the claimant's representative that she was not wearing socks, and merely removed her sandals by using her feet.  Additionally, the report stated that the claimant can wash dishes, sweep and make the bed.  However, the claimant informed the claimant's representative that she told Dr. Sharpe that she could use one arm to pull a blanket over

the bed, and that she could probably do limited sweeping with a broom by using one hand.  The claimant also said that no pinprick testing was done despite the statement in the report that "pinprick is intact throughout upper and lower extremities." The claimant also told him that no testing of the range of motion of the spine was performed that she could recall.  Additionally, the claimant felt that Dr. Sharpe was unnecessarily rude.   The claimant's representative said Dr. Sharpe apparently made no attempt to discover the claimant's medical history according to the report and to the claimant.  Therefore, he requested that Dr. Sharpe's opinion be given no weight. (Exhibit 24E).

Based on the claimant's representative's objections, the undersigned requested assistance from DDS on January 4, 2012, to re-contact Dr. Sharpe, send her a copy of all pertinent medical records, and ask her to clarify the time spent with the claimant and the records she relied upon, if any, prior to her assessment.  (Exhibit 30E).  Dr. Sharpe responded on February 4, 2012, and stated that she spent 25 minutes with the claimant, and reviewed no medical records at the time of the exam. (Exhibit 25F).

The claimant's representative wrote another letter on February 29, 2012, objecting to Dr. Sharpe's consultative exam reports in Exhibits l8F and 25F.  Pursuant to Social Security Regulations 20 CFR 404.1519p and 416.919p, he objected to the consultative examination report because Dr. Sharpe did not adequately assess all of the claimant's diseases, impairments and complaints described in the claimant's history and because the report does not provide evidence that serves as an adequate basis for decision-making.  Dr. Sharpe stated that she had not reviewed any of the claimant's medical records and had only spent 25 minutes with the claimant before completing an examination report indicating that the claimant could perform more than sedentary work (*See* Exhibit 25F).  The claimant's representative asserted that those findings are starkly inconsistent with the opinion of the claimant's treating physician, Dr. Otis Harrison, MD, who indicated on pain questionnaire that the claimant would not be able to work (*See* Exhibit 7F).  Moreover, the claimant's medical records showed that the claimant suffered from, among other things, degenerative disc disease with cervical and lumbar radiculopathy and the presence of a cyst in the left shoulder (*See* Exhibits 6F, 9F, and 15F).  Dr. Sharpe did diagnose pain and arm radiculopathy, but did not diagnose a medical ailment that would result in that pain (*See* Exhibit 18F).  As such, the claimant objected to Exhibits 18F and 25F pursuant to 20 CFR 404.1519p and 416.919p and respec1lttlly requested that no evidentiary weight be assigned thereto.  (Exhibit 28E).

The undersigned notes that the January 4, 2012, request tor DDS assistance to re-contact Dr. Sharpe was proffered to the claimant's representative on April 24, 2012, after he submitted his February 29, 2012, objection letter.   (Exhibit 31E).   His office subsequently submitted another letter noting that the information requested from Dr. Sharpe was not attached to the January 4, 2012, request.   Therefore, a subsequent notice with that evidence attached thereto and additional time to respond was requested.   (Exhibit 32E).   However, it was explained to the representative's office that the January 4, 2012, request for DDS assistance was what was sent to Dr. Sharpe and initiated her response that is in Exhibit 25F, and no additional response is expected from Dr. Sharpe.   Therefore, the representative said their office would be submitting no further response regarding their objection to Dr. Sharpe's report in Exhibits 18F and 25F and did not need additional time to respond as requested in Exhibit 32E.  (Exhibit 33E).

Based on the above mentioned objections, the undersigned gives no weight to Dr. Sharpe's findings and opinion in Exhibits 18F and 25F. While Dr. Sharpe's report in both Exhibits 18F and 25F states: "REVIEW OF RECORDS:  None" as noted by the claimants representative in his objections, her report included a "'HISTORY OF PRESENT ILLNESS" narrative that was generally consistent with the claimant's reports throughout the medical evidence of record.   The claimant told Dr. Sharpe that her symptoms began in 2007 when she had n MVA. She continued to have neck pain, and then had second MVA in January 2010, which the claimant said worsened her neck, left arm and shoulder pain. The claimant also stated that she had a knot surgically removed from her shoulder in November 2010, and had physical therapy and modalities. (Exhibit 18F).

While the undersigned gives no weight to Dr. Sharpe's opinion, it is important to note that her findings did not differ greatly from the remaining medical evidence of record.  Although the claimant told her representative that she did not recall undergoing range of motion testing during her exam with Dr. Sharpe, the claimant's physical exams from Franklin generally showed pain with range of motion in the cervical and/or lumbar spine (*See* Exhibits 6F, 12F, 15F 22F and 28F), and the claimant had diminished range of motion in these areas per Dr. Sharpe's report  in Exhibit 18F.   Dr. Sharpe also noted the claimant had 5/5 muscle bulk, strength and tone, which was also noted in Exhibits 6F and 20F.   The claimant also told her representative that she did not recall undergoing a sensory exam with Dr. Sharpe; however, no neurological deficits have been noted in the record, even in the recent NCS studies. (Exhibits 2F, 5f, 6F, l0F, 19F 20F, 23F, 24F and 28F).

27

Therefore, the undersigned gives significant weight to Dr. Parker's Physical Residual Functional Capacity Assessment in Exhibit 4F. Although Dr. Parker was non-examining, and therefore his opinions does not as a general matter deserve as much weight as those of examining or treating physicians, his opinion does deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions. While Dr. Parker gave his opinion in December 2009, the medical evidence of record as discussed in detail above reflects that the claimant's condition has not varied much over the relevant time period. Dr. Parker noted he assigned the limitation to occasional reaching with the left shoulder due to pain, which is consistent with the medical evidence of record.

The record as a whole reflects that the claimant is capable of performing light work as set forth above, and that she was not disabled for any 12-month period. There is little to no objective support for the claimant's assertion that her impairments are of disabling severity.

**6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

\*        \*        \*

**7.      The claimant was born on January 21, 1976 and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (29 CFR 404.1563 and 416.963).**

**8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**9.      Transferability of job skills is not material to th edetermiantion of disability because using the Medical-Vocational Rules a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.     Considering the claimant's age, education, work experience, and residual functional capacity,  there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).**

\*        \*        \*

**11.     The claimant has not been under a disability, as defined in the Social Security Act, from July 30, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

(Tr. at 28-51 (emphasis in original)).  The Appeals Council affirmed the ALJ's decision (Tr. 1-7), and, thus, the hearing decision became the final decision of the Commissioner of Social Security.

## DISCUSSION

In all Social Security cases, the claimant bears the burden of proving that he is unable to perform his previous work.  *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors:  (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history.  *Id.* at 1005. An ALJ, in turn:

> [U]ses a five-step sequential evaluation to determine whether the claimant is disabled, which considers: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairments in the regulations; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.*, 457 Fed. App'x 868, 870 (11th Cir. 2012)[2] (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f)); *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted).

If a plaintiff proves that he cannot do his past relevant work, as here, it then becomes the Commissioner's burden—at the fifth step—to prove that the plaintiff is capable—given his age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy.  *Phillips*, 357 F.3d at

---

[2]    "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

1237, 1239; *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *cert. denied,* 529 U.S. 1089, (2000); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she can perform those light jobs identified by the vocational expert ("VE"), is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[3] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. App'x 995, 996 (11th Cir. 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). Also, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'" *Id.* (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)).

On appeal to this Court, Jones asserts three reasons why the Commissioner's decision to deny her disability insurance benefits and supplemental security income is in error (*i.e.,* not supported by substantial evidence): (1) the ALJ erred by relying upon the opinion of Dr. Gregory K. Parker, M.D. ("Dr. Parker"), a non-examining, reviewing physician, to support the residual functional capacity ("RFC") for Plaintiff in violation of *Dillard v. Astrue*, 834 F. Supp. 2d 1325, 1332 (S.D. Ala. 2011), citing in part, *Swindle v.*

---

[3]     This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

*Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990); (2) the ALJ erred by refusing to develop the record by ordering an additional orthopedic consultative examination after the ALJ (a) gave no weight to the opinion of Dr. Thomasina Anderson Sharpe, M.D. ("Dr. Sharpe"), an examining physician, and (b) disposed of the opinions of Dr. Otis Harrison, M.D. ("Dr. Harrison"), Jones' treating physician, in violation of *Dillard v. Astrue*, 834 F. Supp. 2d 1325, 1333 (S.D. Ala. 2011) and *Ingram v. Commissioner of Social Security Administration*, 496 F.3d 1253, 1259 (11th Cir. 2007); and (3) the ALJ's RFC determination at the fifth step of the sequential evaluation process was not supported by substantial evidence and entirely abrogated the medical opinions by Dr. Harrison that indicated the Plaintiff could not perform substantial gainful activity. The undersigned will first address the ALJ's assessment of Dr. Harrison's opinion before considering Jones' three claims together within the context of the ALJ's RFC assessment. *See, e.g., Thomas v. Astrue*, No. CA 11–0406–C, 2012 WL 1145211, at *9 (S.D.Ala. Apr. 5, 2012) ("Because the undersigned finds that the ALJ did not explicitly articulate an adequate reason, supported by substantial evidence, for rejecting a portion of [the treating physician's] PCE assessment, this Court must necessarily find that the ALJ's RFC determination is not supported by substantial evidence.").

A.      **The ALJ's Assessment of Dr. Harrison's Opinions**

Dr. Harrison, Jones' treating physician, provided his opinion through three (3) avenues: (1) a Clinical Assessment of Pain (CAP) form dated April 26, 2010 (Tr. at 447-48); (2) a March 18, 2011 letter (Tr. at 509); and (3) a Physical Capacities Evaluation (PCE) dated March 1, 2012 (Tr. at 605). In the CAP form, Dr. Harrison noted that he had treated the claimant since September 2009, and the MRI of her neck showed "disc bulging" at C5-6 and C6-7, which is the underlying cause of her pain.  (Tr. at 447).  He also stated that the claimant's pain is intractable and virtually incapacitating; that

physical activity, such as walking, standing, bending, stooping and moving of the extremities, would increase symptoms to such an extent that bed rest would be necessary; that the pain impacts the claimant's ability to perform her previous work to the extent that she is totally restricted and thus unable to function at a productive level of work; and that the claimant has existed at this level since August 24, 2009.  (Tr. at 447-48).  He noted that Jones was prescribed narcotic pain medication, Darvocet, and will require pain management within the next year.  (Tr. at 448).  Finally, Dr. Harrison did not answer the question regarding whether the claimant could engage in any form of gainful employment on a consistent basis without missing more than 2 days of work per month or frequent interruptions to her work routine, but he did note that she complains of pain.  (Tr. at 448).

In the March 18, 2011 letter addressed to "Whom It May Concern," Dr. Harrison stated, "[Jones] is currently unable to work because of her medical condition.  The current therapy that she has received has not controlled her symptom.  She is currently being referred to another specialist."  (Tr. at 509).  In the PCE, Dr. Harrison stated Jones had the following limitations in an eight-hour workday:  sit for 2 hours at a time, for up to 2 hours per day; stand/walk for 2 hours at a time, for up to 2 hours per day; lift up to 5 pounds for 1 hour; carry up to 5 pounds for 2 hours, and up to 25 pounds for 1 hour; bend, squat and crawl for up to 2 hours; and climb for up to 1 hour.  (Tr. at 605).  Dr. Harrison assigned mild restriction of activities involving unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes, and gases.  (Tr. at 605).  Dr. Harrison said the claimant cannot reach; use her hands for repetitive action such as simple grasping, pushing and pulling of arm controls and fine manipulation; or use her feet for repetitive movements as in

32

pushing and pulling of leg controls. (Tr. at 605). Dr. Harrison did not answer the questions about the length of time the claimant has been impaired or whether she can work 8 hours per day, 40 hours per week on a sustained basis, within the limitations above, without missing more than 2 days of work per month. (Tr. at 605).

The ALJ gave "no weight" to Dr. Harrison's opinions included in the CAP form, the March 18, 2011 letter, and the PCE for the following reasons:

> The undersigned gives no weight to Dr. Harrison's responses in the CAP form for several reasons. First, the course of treatment pursued by Dr. Harrison has not been consistent with pain to such an extent that bed rest is necessary. While Dr. Harrison had been treating the claimant for less than a year when he completed the CAP, he noted her general appearance was normal on several occasions around the time he completed this form. (Exhibits 6F and 9F and 12F). Despite his responses in the CAP, Dr. Harrison has prescribed Lortab to be used on an as needed basis only. (Exhibits 22E, 25E, 29E, 12F, l5F, 20F, 22F and 28F). Second, his more recent treatment notes reflect no increase in dosage or frequency of administration of her medications prescribed for pain. Third, Dr. Harrison identified the November 2009, MRI, which he said showed disc bulges at C5-6 and C6-7, as the underlying cause of her pain. However, Dr. Cope, her former treating orthopedist interpreted this MRI as being negative (*See* Exhibit 5F); and the report of the MRI from the radiologist does not mention issues at the C5-6 or C6-7 disc levels. (Exhibit 3F). Finally, the claimant's office visit on February 10, 2010, less than three months before Dr. Harrison completed the CAP form, shows that she requested that her Social Security form be completed. However, her treatment provider at Franklin said, "I see no restrictions preventing work." (Exhibit 6F).

> \*       \*       \*

> However, no weight is given to [the March 18, 2011] letter because Dr. Harrison's own treatment note from this date fails to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, as Dr. Harrison reported. Specifically, the treatment note from this date reflected the claimant reported her pain was only a 1/10. He noted that her general appearance was normal; and she had pain on range of motion over the cervical spine area. While she stated that her medication was not helping and the epidural did not help, Dr. Harrison continued her on Lortab as previously prescribed. (Exhibit 12F). As noted previously, Dr. Harrison has also characterized her general appearance as "normal" no physical exam.

> \*       \*       \*

The undersigned gives no weight to Dr. Harrison's PCE in Exhibit 27F because it is conclusory, internally inconsistent, and not supported by his own treatment records. In the PCE, Dr. Harrison found the claimant could sit for 2 hours at a time, for up to 2 hours per day and stand/walk for 2 hours at a time, for up to 2 hours per day. However, he provided no explanation of the evidence relied on in forming that opinion: and as noted above, the claimant's physical exams from Franklin generally show some spinal tenderness, left shoulder with pain on palpation of the cervical spine and/or pain with range of motion in the cervical and/or lumbar spine. (Exhibits 6F, 12F, 15F, 22F and 28F). Additionally, some of the limitations set forth in the PCE are internally inconsistent. For example, he said the claimant could only lift up to 5 pounds, but was able to could carry up to 25 pounds. Dr. Harrison also said the claimant cannot reach, but can climb for 1 hour a day. He said the claimant cannot use her feet for pushing/pulling, but can bend, squat and crawl for up to 2 hours in an 8-hour workday. Dr. Harrison also said she cannot use her hands for repetitive action such as simple grasping, pushing and pulling of arm controls and fine manipulation; however, she has received no significant treatment for problems with her hands that would affect her manipulative abilities during the period of adjudication. The undersigned notes that Dr. Harrison assigned *mild* restriction of activities involving environmental irritants, which does not readily translate into vocational terms.

The undersigned notes that the possibility always exists that a treating physician may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. Dr. Harrison 's opinion is without substantial support from the other evidence of record, which obviously renders it less persuasive. Social Security Rulings 96-2p and 96-5p indicate that controlling weight may not be given to a treating physician's opinion unless it also is "not inconsistent" with the other substantial evidence in the case record. Therefore, Dr. Harrison's opinion cannot be given controlling weight.

(Tr. at 45-47).

As the plaintiff's treating physician, Dr. Harrison's opinions "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Gilabert v. Comm'r of Soc. Sec.*, 396 Fed. App'x 652, 655 (11th Cir. 2010) (per curiam) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). Good cause is

shown when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* (quoting *Phillips v. Barnhart,* 357 F.3d 1232, 1241 (11th Cir. 2004)). "Where the ALJ articulate[s] specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error." *Id.* (quoting *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005)).

The Court finds that the ALJ has shown good cause by articulating specific reasons supported by substantial evidence for giving "no weight" to the Dr. Harrison's opinion.  As the ALJ stated, Dr. Harrison's conclusions in the CAP form are inconsistent with the physician's own medical records, and the evidence of record supports a contrary finding.  Despite indicating that Jones' pain was "virtually incapacitating" and that physical activity would necessitate "bed rest," Dr. Harrison stated in multiple treatment notes from multiple physical examinations around the same time the CAP form was completed that Jones' appearance was normal (Tr. at 411, 413, 453, 455, 510 & 512) and that Jones should take Lortab for pain on an as needed basis only (Tr. at 350, 357, 364, 511, 513, 515, 524 & 586). In addition, Dr. Harrison provided in the CAP form that a MRI of Jones' neck showed that she has a disc bulging at C5-6 and C6-7, which is the underlying cause of her pain. However, Dr. G. H. Martindale, M.D., the reading radiologist, did not mention any issues at the C5-6 or C6-7 disc levels in his final report accompanying Jones' most recent MRI preceding the completion of the CAP form.  (Tr. at 388 ("There is straightening and very mild reversal of the normal cervical lordosis which is likely due to patient position.  Vertebral body height and signal intensity are with normal limits.  The disc spaces are well preserved and no disc herniation is seen in the cervical spine.  At T1-2, there is a very small left posterolateral disc protrusion

which minimally effaces the thecal sac but which is of doubtful clinical significance.")).
Indeed, Dr. Stephen B. Cope, M.D., the claimant's former treating orthopedist,
interpreted this MRI as being negative in his treatment records.  (Tr. at 409).   In
addition, three months prior to the date Dr. Harrison completed the CAP form, a
treatment physician at Franklin Primary Health Center, Inc. ("FPHC"), where Dr.
Harrison is employed, stated the following after Jones' office visit: "I see no restrictions
preventing work."  (Tr. at 417).

       As for the March 18, 2011 letter, the ALJ stated that Dr. Harrison's conclusions in
the letter are inconsistent with Dr. Harrison's own treatment note from the same date,
which reflects that Jones' reported pain assessment was only a 1/10, her general
appearance was normal; she had pain on range of motion over the cervical spine area;
and Dr. Harrison continued her on Lortab as previously prescribed.  (Tr. at 510-11).
Finally, the ALJ stated that Dr. Harrison's PCE was conclusory, internally inconsistent,
and not supported by his own treatment records.  First, Dr. Harrison did not provide
any explanation (in the PCE or the accompanying treatment notes) of the evidence he
relied on in forming his conclusions that Jones could sit for 2 hours at a time, for up to
2 hours per day and stand/walk for 2 hours at a time, for up to 2 hours per day (Tr.
at 605-07), whereas Jones' physical exams from FPHC generally only show some
spinal tenderness, left shoulder with pain on palpation of the cervical spine and/or
pain with range of motion in the cervical and/or lumbar spine. (Tr. at 411-24, 427-32,
436-46, 510-14, 521-24, 583-86 & 606-10).  Also, Dr. Harrison stated that Jones cannot use
her hands for repetitive action such as simple grasping, pushing/pulling arm
controls, and fine manipulation, but, as the ALJ points out, Jones has not received any
significant treatment for problems with her hands that would affect her manipulative

36

abilities during the period of adjudication.  Finally, some of the limitations set forth by Dr. Harrison in the PCE are internally inconsistent, such as Dr. Harrison's conclusions that Jones could only lift up to 5 pounds but could carry up to 25 pounds; that Jones could not reach but could climb for 1 hour a day; that Jones could not use her feet for pushing/pulling but could bend, squat and crawl for up to 2 hours in an 8-hour workday.  (Tr. at 605).

For the foregoing reasons, the Court finds that the ALJ articulated good cause for giving "no weight" to Dr. Harrison's opinions and, thus, did not commit reversible error.  Having made that determination, the Court now turns to Jones' three claims on appeal and whether the ALJ's RFC assessment is supported by substantial evidence.

## B.   The ALJ's RFC Assessment

Initially, the Court notes that the responsibility for making the RFC determination rests with the ALJ.  *Compare* 20 C.F.R. §§ 404.1546(c) & 416.946(c) ("If your case is at the administrative law judge hearing level . . . , the administrative law judge . . . is responsible for assessing your residual functional capacity.") *with, e.g., Packer v. Comm'r, Soc. Sec. Admin.*, 542 Fed. App'x 890, 891-92 (11th Cir. 2013) (per curiam) ("An RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. There is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." (internal citation omitted)). A plaintiff's RFC—which "includes physical abilities, such as sitting, standing or walking, and mental abilities, such as the ability to understand, remember and carry out instructions or to respond appropriately to supervision, co-workers and work pressure[]"—"is a[n] [] assessment

of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." *Watkins*, 457 Fed. App'x at 870 n.5 (citing 20 C.F.R. §§ 404.1545(a)-(c) & 416.945(a)-(c)). Here, the ALJ determined Jones' physical RFC as follows:

> **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a reduced range of light work as defined in 20 CFR 404.1567(b) and 416.967(b), in function by function terms (SSRs 83-10 and 06-8p), with certain non-exertional restrictions associated with that level of exertion. The claimant's specific physical capabilities during the period of adjudication have been the ability to lift/carry up to 10 pounds frequently and 20 pounds occasionally; sit for about 6 hours per day; stand and/or walk for up to 6 hours per day; perform limited pushing and/or pulling with the upper extremities; perform pushing and/or pulling with the lower extremities without limitation; use the right hand for reaching (including overhead), handling, fingering and feeling without limitation; use the left hand for reaching (including overhead) occasionally, and for handling, fingering and feeling without limitation; climb stairs and ramps, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch and crawl without limitation. The claimant could work in a job environment that would allow her to avoid concentrated exposure to extreme heat, extreme cold, hazardous machinery and heights. The claimant is capable of performing unskilled work.**

(Tr. at 30 (emphasis in original)).

To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has "'provide[d] a sufficient rationale to link'" substantial record evidence "'to the legal conclusions reached.'" *Ricks v. Astrue*, No. 3:10-cv-975-TEM, 2012 WL 1020428, at *9 (M.D. Fla. Mar. 27, 2012) (quoting *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005)); *compare id. with Packer v. Astrue*, No. 11-0084-CG-N, 2013 WL 593497, at *4 (S.D. Ala. Feb. 14, 2013) ("'[T]he ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work.'"), *aff'd,* 542

Fed. Appx. 890 (11th Cir. 2013);[4] *see also Hanna v. Astrue*, 395 Fed. Appx. 634, 636 (11th Cir. 2010) (per curiam) ("The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review. . . . Absent such explanation, it is unclear whether substantial evidence supported the ALJ's findings; and the decision does not provide a meaningful basis upon which we can review [a plaintiff's] case." (internal citation omitted)).[5]

In her brief, Jones relies on one of this Court's prior decisions, *Dillard v. Astrue*, 834 F. Supp. 2d 1325 (S.D. Ala. 2011), for the proposition that the ALJ's RFC determination must be supported by the assessment of an examining or treating physician. (*See* Doc. 12). In order to find that the ALJ's RFC assessment is supported by substantial evidence, however, it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician. *See, e.g., Packer*, 2013

---

[4]     In affirming the ALJ, the Eleventh Circuit rejected Packer's substantial evidence argument, noting, she "failed to establish that her RFC assessment was not supported by substantial evidence[]" in light of the ALJ's consideration of her credibility and the medical evidence. *Id.* at 892.

[5]     It is the ALJ's (or, in some cases, the Appeals Council's) responsibility, not the responsibility of the Commissioner's counsel on appeal to this Court, to "state with clarity" the grounds for an RFC determination. Stated differently, "linkage" may not be manufactured speculatively by the Commissioner—using "the record as a whole"—on appeal, but rather, must be clearly set forth in the Commissioner's decision. *See, e.g., Durham v. Astrue*, No. 3:08CV839-SRW, 2010 WL 3825617, at *3 (M.D. Ala. Sept. 24, 2010) (rejecting the Commissioner's request to affirm an ALJ's decision because, according to the Commissioner, overall, the decision was "adequately explained and supported by substantial evidence in the record"; holding that affirming that decision would require that the court "ignor[e] what the law requires of the ALJ[; t]he court 'must reverse [the ALJ's decision] when the ALJ has failed to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted'" (quoting *Hanna*, 395 Fed. App'x at 636 (internal quotation marks omitted))); *Id.* at *3 n.4 ("In his brief, the Commissioner sets forth the evidence on which the ALJ *could have* relied . . . . There may very well be ample reason, supported by the record, for [the ALJ's ultimate conclusion]. However, because the ALJ did not state his reasons, the court cannot evaluate them for substantial evidentiary support. Here, the court does not hold that the ALJ's ultimate conclusion is unsupportable on the present record; the court holds only that the ALJ did not conduct the analysis that the law requires him to conduct." (emphasis in original)); *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons he gave.").

WL 593497, at *3 ("[N]umerous court have upheld ALJs' RFC determinations notwithstanding the absence of an assessment performed by an examining or treating physician."); *McMillian v. Astrue,* No. 11-00545-C, 2012 WL 1565624, at *4 n.5 (S.D. Ala. May 1, 2012) (noting that decisions of this Court "in which a matter is remanded to the Commissioner because the ALJ's RFC determination was not supported by substantial and tangible evidence still accurately reflect the view of this Court, but not to the extent that such decisions are interpreted to require that substantial and tangible evidence must—in all cases—include an RFC or PCE from a physician" (internal punctuation altered and citation omitted)); *but cf. Coleman v. Barnhart,* 264 F. Supp. 2d 1007 (S.D. Ala. 2003). Therefore, the Court finds that Jones' reliance on *Dillard* is misguided, and her assertion that the ALJ's RFC determination must be supported by the assessment of an examining or treating physician is without merit.

In this case, there are physical assessments of record from a treating physician and an examining physician.  As previously discussed, however, the ALJ properly gave "no weight" to Dr. Harrison's opinions.  In addition, the ALJ appropriately gave "no weight" to the opinions and findings contained in examining physician Dr. Sharpe's consultative examination report (*see* Tr. at 543-54 & 602-03).[6]  Contrarily, the ALJ properly accorded Dr. Parker's physical RFC assessment "significant weight," a determination consistent with substantial evidence in the record, as explained more fully below.

---

[6]      As the ALJ details in her decision (Tr. at 47-49), Jones' counsel objected to Dr. Sharpe's consultative examination via letters (*see* Tr. at 354-56, 362-63) requesting that the ALJ give Dr. Sharpe's examination and opinion no weight for several reasons, including that Dr. Sharpe's report contained an admission that he did not review any records.  The ALJ agreed with Jones' counsel and accordingly gave Dr. Sharpe's opinion "no weight."  (Tr. at 48).

Importantly, in establishing Jones' RFC, which means determining Jones' "remaining ability to do work despite her impairments[,]" *Packer*, 542 Fed. App'x at 891—keeping a focus on the extent of those impairments as documented by the credible record evidence—the ALJ painstakingly sifted through the medical evidence of record (*see* Tr. at 32-49), along with the claimant's testimony (*see* Tr. 31-32 & 41-45), to conclude that Jones "is capable of lifting/carrying up to 10 pounds frequently and 20 pounds occasionally; sitting for about 6 hours per day; standing and/or walking tor up to 6 hours per day; performing pushing and/or pulling with the lower extremities without limitation; and climbing stairs and ramps, climbing ladders/ropes/scaffolds, balancing, stooping, kneeling, crouching and crawling without limitation."   (Tr. at 42). For instance, the ALJ considered Jones' numerous medical records, including her multiple MRI reports, x-rays, nerve conduction study (NCS) results, and treatment notes from multiple physicians.  (*See* Tr. at 32-49). The ALJ also considered Jones' own function report regarding her abilities and daily activities (*see* Tr. at 41), her own questionnaires regarding pain and headaches (*see* Tr. at 41-44), and her testimony at the hearing before the ALJ about the severity of her impairments and disabilities.  (Tr. at 31-32 & 41-45).[7]

As previously discussed, the ALJ also considered Dr. Parker's December 7, 2009 physical RFC assessment; Dr. Sharpe's August 2011 physical consultative examination; and Dr. Harrison's April 26, 2010 CAP form, March 18, 2011 letter, and March 1, 2012 PCE.  Because the ALJ articulated good cause to reject the opinions of Dr. Harrison and Dr. Sharpe, the ALJ did not err in giving "significant weight" to non-examining state agency physician Dr. Parker's assessment that Jones: (1) can occasionally lift and carry

---

[7]     Specifically, the ALJ found that Jones's testimony was "less than fully credible" because she made several statements regarding her disability that were inconsistent the evidence of record.  (*See* Tr. at 44-45).

up to 20 pounds and frequently up to 10 pounds; (2) can stand and/or walk for about 6 hours in an 8-hour workday; (3) can sit for about 6 hours in an 8-hour workday; (4) can perform limited pushing and/or pulling in the upper extremities and unlimited pushing and/or pulling with the lower extremities; (5) can reach with the right upper extremity without limitation; (6) can reach with the left shoulder occasionally; (7) can perform unlimited handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors); (8) has no communicative, postural, or visual limitations; and (9) should avoid concentrated exposure to extreme heat, extreme cold, and hazardous machinery and heights. *See Thomas v. Colvin*, No. 11-00569-B, 2015 WL 4458861, at *14 & n.8 (S.D. Ala. July 21, 2015) ("Because the ALJ had good cause to discount [the treating physician's] opinions, the opinions of non-examining State Agency [physician] do not conflict with any credible examining source, and thus, they were properly considered by the ALJ."); *Milner v. Barnhart*, 275 Fed. App'x 947, 948 (11th Cir. 2008) ("The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.' 20 C.F.R. § 404.1527(f)(2)(i). The ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources. *Edwards v. Sullivan*, 937 F.2d 580, 584-85 (11th Cir. 1991).").[8]

---

[8]     The Court notes that Dr. Parker properly explained and "linked" his RFC findings/limitations to substantial evidence in the record.   (*See* Tr. at 401-05 (referring specifically to the claimant's symptoms as well as the results of a "lift-off test," "neurologic exam," radiographs and MRI scans).  *Cf. Woods v. Colvin*, NO. 15-0020-C, 2015 WL 5679750, at *9 (S.D. Ala. Sept. 24, 2015) ("And perhaps the ALJ's reliance upon [the non-examining, reviewing physician's] RFC assessment would have sufficed had [the physician] properly "linked" his RFC findings/limitations to substantial evidence in the record, as is even directed on the form he completed.").

This analysis shows to this Court that the ALJ considered Jones' physical condition as a whole in determining her physical RFC. Accordingly, the ALJ's physical RFC determination provides an articulated linkage to the medical evidence of record. The linkage requirement is simply another way to say that, in order for this Court to find that an RFC determination is supported by substantial evidence, ALJs must "show their work" or, said somewhat differently, show *how* they applied and analyzed the evidence to determine a plaintiff's RFC. *See, e.g., Hanna*, 395 Fed. Appx. at 636 ("[An ALJ's] decision [must] provide a meaningful basis upon which we can review [a plaintiff's case"); *Ricks*, 2012 WL 1020428, at *9 (an ALJ must "explain the basis for his decision"); *Packer*, 542 Fed. App'x at 891-92 ("[An ALJ must] provide **enough reasoning** for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole[]" (emphasis added)). Thus, by "showing her work," the ALJ has provided the required "linkage" between the record evidence and her RFC determination necessary to facilitate this Court's meaningful review of her decision.

As for Jones' argument that the ALJ erred by failing to develop the record, in violation of *Dillard*, by ordering an additional orthopedic consultative examination after she gave no weight to the opinions of Dr. Harrison and Dr. Sharpe, the Court reiterates that the claimant's reliance on *Dillard* is misguided and that it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician. *See, e.g., Packer*, 2013 WL 593497, at *3; *McMillian*, 2012 WL 1565624, at *4 n.5. Instead, while the ALJ has a "basic duty to a basic duty to develop a full and fair record," *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (per curiam); *see also Ingram v. Commissioner of Social Security Administration*, 496 F.3d 1253, 1269 (11th Cir. 2007), the ALJ "is not required to order a consultative examination as long as the record contains sufficient evidence for the [ALJ] to make an informed decision." *Ingram*, 496

F.3d at 1269; *see also Hollis v. Colvin*, NO. 14-00268-B, 2015 WL 4429051, at *5-6 (S.D. Ala. July 20, 2015).  Here, the Court finds that the evidence of record, which includes an immense amount of physician treatment notes and testing results, a credible RFC assessment conducted by a non-examining state agency physician, and reports and questionnaires completed by the claimant herself, contains sufficient evidence for the ALJ to have made an informed decision. Accordingly, the Court finds that the ALJ did not err by failing to further develop the record.

Because substantial evidence of record supports the Commissioner's determination that Jones can perform the physical and mental requirements of a reduced range of light work as identified by the ALJ (*see* Tr. at 30-49), and the plaintiff makes no argument that this RFC would preclude her performance of the light unskilled jobs identified by the VE during the administrative hearing (*compare* Doc. 12 *with* Tr. 50-51 & 66-76), the Commissioner's fifth-step determination is due to be affirmed.  *See, e.g., Owens v. Comm'r of Soc. Sec.*, 508 Fed. App'x 881, 883 (11th Cir. 2013) ("The final step asks whether there are significant numbers of jobs in the national economy that the claimant can perform, given his RFC, age, education, and work experience. The Commissioner bears the burden at step five to show the existence of such jobs . . . [and one] avenue[] by which the ALJ may determine [that] a claimant has the ability to adjust to other work in the national economy . . . [is] by the use of a VE[.]" (internal citations omitted)); *Land v. Comm'r of Soc. Sec.*, 494 Fed. App'x 47, 50 (11th Cir. 2012) ("At step five . . . 'the burden shifts to the Commissioner to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.' The ALJ may rely solely on the testimony of a VE to meet this burden." (internal citations omitted)).

## CONCLUSION

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 30th day of September 2015.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**